(No. 74-CC-0058—)

DOROTHY TODD, Administratrix of the Estate of RONALD STEGE TODD, Claimant, *v.* STATE OF ILLINOIS, Respondent.

*Opinion filed April 13, 1978.*

EDWIN M. BERMAN, of BERMAN & NEWMAN, Attorney for Claimant.

WILLIAM J. SCOTT, Attorney General; RICHARD GROSSMAN, Assistant Attorney General, for Respondent.

HOLDERMAN, J.

This action is based on a claim of negligence resulting in the death of Ronald Stege Todd, on October 9, 1972, at the Madden Center, a State of Illinois facility.

The deceased had noticeable behavior changes after his wife's pregnancy was terminated in 1971 due to the death of the fetus. He sought and received the attention of Dr. Bernard R. Kirk, a psychiatrist, early in 1972. Dr. Kirk signed commitment papers for Ronald Todd on September 28, 1972, and he took two months off work during March and April of 1972, at which time he took weekly treatments.

Todd had previously been working as a meat cutter at Dominick's for approximately six years, with a history of regular attendance at a gross pay of $226.00 per week.

The record indicates that on at least two occasions

he had tried to kill his wife and that there were several suicide attempts.

It is quite evident that for some period of time this man had undergone considerable emotional stress and was acting in a completely irrational manner.

On September 29, 1972, Todd voluntarily committed himself to Madden Center where he was examined by Dr. Rucci, an employee of the facility. Although Dr. Rucci knew of Dr. Kirk's treatment, he never contacted him relative to the treatment given Todd. He continued using the same two drugs Dr. Kirk had given Todd, but removed from him all medication on October 5, 6 and 7 because of side effects.

On October 6, 1972, Dr. Rucci found that Todd was still suicidal and homicidal but did not place him on suicidal precaution. The only thing done, was to place him in a room used for individuals in this condition called a "choir room."

On October 9, 1972, Todd was visited late in the afternoon by his wife who left fairly early in the evening. His disappearance was discovered about 9:00 that evening. His body was discovered the next day at the bottom of a flight of stairs which, according to the meager information in the records, was located some distance from the place where the patient was incarcerated.

The autopsy report showed six milligrams percent alcohol in Todd's blood and an analysis of bile and urine showed the presence of 1.0 mg. percent and 3.0 mg. percent morphine perspectively. There was no explanation as to how the pure morphine was found in the bile.

Following the death of the deceased, a bottle of

vodka was found under the mattress of Todd's bed.

Dr. Alexis Arieff was the Claimant's expert witness. His major disagreement with Dr. Rucci's treatment was that he would have placed Todd in a closed facility that does not have open doors. Madden Center has no such facilities.

After the deceased's disappearance, the individual in charge of the floor stated that a report was made to security forces of his disappearance. There is no report of any kind or character indicating what, if any, search was made by security. There is also no evidence to show when the body was found or whether it was found by security or by chance.

This record relative to the efforts made by the personnel trying to locate the missing individual leaves many questions unanswered.

The record disclosed that the deceased had been granted a pass by Dr. Rucci on October 4, 1972, allowing him to walk around the grounds. There is nothing in the record to indicate any change after the finding of Dr. Rucci on October 6, 1972, that the deceased was still suicidal and homicidal. The record is void as to any change in treatment of precautions after that date except for the placing of the deceased in the "choir room."

This Court has previously held on many occasions that the State of Illinois is not an insurer of mental patients.

A hospital is not an insurer of a patient's safety, but owes the patient the duty of protection, and must exercise such reasonable care as the patient's known condition may require. *Karluski v. Board of Trustees, University of Ill. 25 Ill.Ct.Cl. 295.*

When an act that has caused an injury is shown to be under the management of the party charged with negligence, and the accident is such as that in the ordinary course would not have happened if those who had management used proper care, the accident itself affords reasonable evidence, in the absence of an explanation by the parties charged, that it arose from the want of proper care. *Hall v. U.S.* 136 FS 187, (La. 1965) Restated in Ill. Law, 36-54 (Professional Malpractice Res Ipsa Loquitur) *Westschester v. State of Illinois, 27 Ill.Ct.Cl. 327 (1971)*.

It has also been held that reasonable caution must be used for the protection of patients on welfare.

After reading the very volumnious record in this case, the Court still has many unanswered questions regarding the precautions, or lack of precautions, taken by the State. The record is completely silent as to whether or not there was more than one search made of the deceased's bed, whether searches were regularly made after the deceased had visitors, whether or not visitors were warned about bringing alcoholic beverages for the patient's use, and it does not indicate whether or not the bed of the deceased was ever searched after he was placed in there and prior to the discovery of the body.

The record does not show what type of search was made for the deceased except for a perfunctory ten minute search by the people in charge of the floor on which he was located and there is a complete lack of evidence showing whether any search was made for him by security and, if so, whether or not the area in which the body was found was searched.

For the above reasons, it is the opinion of the Court that the State was negligent in the care of an individ-

ual who, on the day prior to his death, had been pronounced suicidal and homicidal and yet was not placed on suicidal and homicidal precautions even though these findings were by the institution's own doctor. This lack of precaution, plus the finding of the alcoholic beverage in the bed of the deceased, is very strong evidence to the effect that the State violated its duty to give proper supervision to the deceased and that, as a result thereof, the deceased met his death.

The undisputed medical testimony is to the effect that the deceased was an individual with homicidal tendencies as well as suicidal tendencies. It would appear to the Court that an individual who has homicidal tendencies which could endanger the lives of innocent people would require a very high degree of care and supervision, all of which is completely lacking in the present case. It is indeed fortunate that the suicidal tendencies, if that was the cause of death, prevailed over those of the homicidal tendencies; otherwise we could have had several real tragedies to contend with.

As to damages in this case, there are some real questions raised. The evidence indicates that this man had been a regular worker earning approximately $226.00 per week. As to the future employment of this individual, the evidence presented showed that a high percentage of individuals with this type of affliction do regain a normal life.

The record indicates, however, that this individual was deteriorating very rapidly and there is substantial question as to how many years he would have been able to continue in his occupation. The record would indicate, at best, that at the rate of deterioration he was showing at the time of his death, his workable life would be of comparatively short duration.

The Court therefore makes an award in the amount of $58,750.00 to Dorothy Todd, the wife and sole surviving next of kin of the deceased.